IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-01247-PAB

BRIAN J. SEDLAK,

       Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

       Defendant.

_____

**ORDER**
_____

      This matter is before the Court on plaintiff Brian J. Sedlak's complaint [Docket No. 1], filed on May 10, 2011. Plaintiff seeks review of the final decision of defendant Carolyn W. Colvin (the "Commissioner") denying plaintiff's claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-33 and 1381-83c.[1] The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 405(g).

**I. BACKGROUND**

      On November 2 and 21, 2001, plaintiff applied for disability benefits under Title II and Title XVI of the Act. R. at 20. Plaintiff alleged that he had been disabled since January 15, 2001. *Id*.; R. at 63. Plaintiff filed a second application for benefits on October 11, 2002, which was consolidated with his 2001 claims. *Id*. After an initial administrative denial of his claim and two hearings before an Administrative Law Judge

_____

    [1] The Court has determined that it can resolve the issues presented in this matter without the need for oral argument.

("ALJ"), plaintiff's claim was denied on January 23, 2004.  R. at 30.  Plaintiff appealed

and, on defendant's motion, another court in this district remanded the case for further

consideration.  R. at 402-08.  Plaintiff filed a third application for benefits in June 2004,

which was consolidated with his existing claims on remand. R. at 535.  The ALJ

permitted plaintiff to amend the alleged onset date of his disability to January 14, 2004.

R. at 586.  After a hearing on October 26, 2005, the ALJ denied plaintiff's claims on

December 1, 2005.  R. at 385.  Plaintiff appealed this denial.  On December 22, 2005,

plaintiff filed a new claim for benefits, which was consolidated with his existing claims.

R. at 747.  On March 24, 2008, another judge in this district remanded the case and

directed the ALJ to:

> a.  Reevaluate whether plaintiff's physical impairments are "severe" within the meaning of the regulations, and if he finds that they are, determine whether they meet or equal in severity any listed impairment;
>
> b.  Recontact any of the treating or examining physicians for further clarification of their findings, seek the testimony of medical experts, order subsequent consultative examinations, or otherwise further develop the record as he deems necessary;
>
> c.  Reevaluate plaintiff's residual functional capacity in light of his determinations regarding plaintiff's physical impairments; and
>
> d. Reassess the disability determination.

*Sedlak v. Astrue*, No. 07-cv-00250-REB, 2008 WL 791937, at *4 (D. Colo. Mar. 21,

2008).  After a hearing on April 21, 2009, the ALJ denied plaintiff's claims on June 29,

2009.  R. at 732.

The ALJ found that plaintiff had the severe impairments of "bipolar disorder;

depression; anxiety disorder; and alcohol dependence."  R. at 715.  The ALJ found that

these impairments did not meet one of the regulations' listed impairments, R. at 718,

and ruled that plaintiff had the residual functional capacity ("RFC") to

> [P]erform a full range of work at all exertional levels but with the following nonexertional limitations: he is able to understand, remember, and carry out one to five step instructions; conform to routine workplace standards; concentrate and attend to tasks which require the ability to understand, remember, and carry out one to five steps; and make routine workplace decisions.  The claimant is limited to frequent interaction with co-workers, supervisors, and the general public.  He is able to work in proximity to people on a continuous basis without being a distraction.

R. at 719.  Based upon this RFC and in reliance on the testimony of a vocational expert ("VE"), the ALJ concluded that plaintiff is not disabled because he is able to perform his past relevant work, as well as other jobs that exist in significant numbers in the economy.  R. at 732.  Plaintiff appealed and the Appeals Council declined to assume jurisdiction over this matter.  R. at 700-02.  Consequently, the ALJ's decision is the final decision of the Commissioner.

## II.  ANALYSIS

### A.  Standard of Review

Review of the Commissioner's finding that a claimant is not disabled is limited to determining whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole.  *See Angel v. Barnhart*, 329 F.3d 1208, 1209 (10th Cir. 2003).  The district court may not reverse an ALJ simply because the court may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in her decision.  *See Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990).  "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).  Moreover, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  The district court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  *Flaherty*, 515 F.3d at 1070.  Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence."  *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

### B.  The Five-Step Evaluation Process

To qualify for disability benefits, a claimant must have a medically determinable physical or mental impairment expected to result in death or last for a continuous period of twelve months that prevents the claimant from performing any substantial gainful work that exists in the national economy.  42 U.S.C. § 423(d)(1)-(2).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A) (2006).  The Commissioner has established a five-step sequential evaluation process to determine whether a claimant is disabled.  20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).  The steps of the evaluation are:

> (1) whether the claimant is currently working; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets an impairment listed in appendix 1 of the relevant regulation; (4) whether the impairment precludes the claimant from doing his past relevant work; and (5) whether the impairment precludes the claimant from doing any work.

*Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (citing 20 C.F.R.

§ 404.1520(b)-(f)).  A finding that the claimant is disabled or not disabled at any point in

the five-step review is conclusive and terminates the analysis.  *Casias v. Sec'y of*

*Health and Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

The claimant has the initial burden of establishing a case of disability.  However,

"[i]f the claimant is not considered disabled at step three, but has satisfied her burden of

establishing a prima facie case of disability under steps one, two, and four, the burden

shifts to the Commissioner to show the claimant has the residual functional capacity

(RFC) to perform other work in the national economy in view of her age, education, and

work experience."  *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005);

*see also Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5 (1987).  While the claimant has the

initial burden of proving a disability, "the ALJ has a basic duty of inquiry, to inform

himself about facts relevant to his decision and to learn the claimant's own version of

those facts."  *Hill v. Sullivan*, 924 F.2d 972, 974 (10th Cir. 1991).

### C.  Severe Impairments

Plaintiff argues that the ALJ erred in failing to find that he suffers from a severe

physical impairment.  Docket No. 17 at 8-10.  Defendant counters that the ALJ's

determination is supported by substantial evidence.  Docket No. 18 at 11-14.

A plaintiff seeking disability benefits must show that his inability to perform

substantial gainful activity results from "anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques.  A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings."  20 C.F.R. § 404.1508.  An impairment is "severe" if it "significantly limit[s]" a claimant's "physical or mental ability to do basic work activities," such as walking, standing, sitting, seeing, hearing, speaking, carrying out simple instructions, using judgment, responding appropriately to supervision or coping with changes in routine.  20 C.F.R. § 404.1521.

An ALJ must consider the opinions of reviewing physicians and evaluate them based on the factors listed in 20 C.F.R. § 404.1527(a) to (d), "such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations [the physicians] provides, and any other factors relevant to the weighing of the opinions."  20 C.F.R. § 404.1527(e)(2)(ii).  Unless the opinion of a treating source is given controlling weight, an ALJ must explain the weight given to the opinion of a reviewing physician.  *Id*.

Plaintiff argues that the ALJ erred in relying on the opinion of Dr. Alan Frank, a reviewing physician who testified at plaintiff's April 21, 2009 hearing, because Dr. Frank's testimony does not indicate whether he reviewed medical records relating to plaintiff's gastrointestinal and abdominal pain.  Docket No. 17 at 9-10.

The Stout Street Clinic's medical records indicate that plaintiff experienced digestive problems in April 2008 related to taking Zoloft, but that these symptoms dissipated in summer 2008 after he switched medications.  *See* R. at 923 (March 18, 2008 record stating "Pt called . . . symptoms of GI upset following Zoloft dose.  Reports

6

nausea, stomach upset."), 920 (April 29, 2008 record stating "Black stools. Colonoscopy due."), 919 (May 20, 2008 record stating "No longer having tarry stools, eating well, and no ab. pain"), 918 (July 14, 2008 record stating "No black stools since 4/08"), 916 (July 22, 2008 record stating "has an ulcer – stopped Zoloft – lost 40 lbs . . . Zoloft dc'd b/c of GI pain"), 914 (September 18, 2008 record stating "he's not been on an antidepressant since stopping Zoloft 3 mos ago because of nausea & loss of appetite – lost 30 lbs. . . . Since he's not able to tolerate Zoloft, will start on Celexa"), R. at 913 (October 21, 2008 record stating "new Zoloft helpful – Black stools; 7/22 reports loss of 40 lbs. on Zoloft . . . Endoscopy & Colonoscopy 10/24"), 975 (December 2, 2008 record stating "Stomach settled – no nausea or pain"); *see also* R. at 959 (report from October 24, 2008 colonoscopy stating that "[g]iven remote history of patient reported melena and no further symptoms, not anemic would not pursue further gi evaluation unless has unexplained recurrent symptoms") and R. at 960 (report from October 24, 2008 endoscopy stating that the "exam of the esophagus, stomach and duodenum was normal.  Retroflexion revealed a normal stomach.").

At the April 2009 hearing, Dr. Frank testified that:

> [Plaintiff] has complained of backache and has been alleged to have degenerative disk disease of his lumbosacral spine.  I've looked through the files for records, for x-ray reports and MRI reports.  I couldn't find them in the file, if, if, if they are, in fact, there.  He had some chest complaints, his electrocardiogram is found to be normal.  In, last year at the Denver Health Center, it was noted that he had an elevated hemoglobin, serum hemoglobin and elevated hematocrit.  Not markedly elevated, but nevertheless, somewhat elevated.  Oh, x-rays have shown evidence of fatty infiltration of his, of his liver and pancreas.  He has high blood pressure and back pain as I've stated.  He's complained of dizziness.  There's a history of substance abuse and alcoholism.  And that, that's it, Your Honor, that's, that's all I was able to get from this file.

R. at 1079.  At step two of his analysis, the ALJ found that Dr. Frank's opinion was supported by objective medical signs and findings, that Dr. Frank had ample knowledge of the Social Security regulations, and that Dr. Frank "has had the opportunity to review the entire medical evidence of record" before offering his opinion.  R. at 718. Accordingly, the ALJ gave great weight to Dr. Frank's opinion and concluded that plaintiff's "complaints of arthritic type pain and musculoskeletal conditions constitute no more than a slight abnormality that imposes no more than a minimal effect on his ability to perform basic work activities."  *Id*.  The ALJ did not discuss plaintiff's gastrointestinal problems at step two.  R. at 715-18.

In assessing plaintiff's RFC, the ALJ recognized that plaintiff's anxiety attacks result at times in nausea, stomach irritation, decreased appetite and that plaintiff lost thirty to forty pounds in 2008.  R. at 720.  The ALJ stated that "[m]ore recent treatment records indicate the claimant reported in early 2008 that he was drinking two to three times a month, with occasional binge drinking that resulted in abdominal pain" and noted that these problems continued until at least June 2008.  R. at 721-22 (citing R. at 878 and 892 (Denver Health Medical Center records from spring 2008 documenting plaintiff's complaints of abdominal pain and nausea) and R. at 847 (Denver Health Medical Center record from June 5, 2008 documenting plaintiff's complaints of abdominal pain)).

The plaintiff's date last insured was March 31, 2004, R. at 713; Docket No. 17 at 6, and thus, he had "the burden of proving that [he] was totally disabled on that date or before."  *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010).

The records from the Stout Street Clinic indicate only that, for a short time in

8

2008, plaintiff experienced digestive problems linked to taking Zoloft, which subsided once he switched medications.  Since the treatment records do not refer to any gastrointestinal problems prior to plaintiff's date last insured in 2004, the fact that Dr. Frank did not discuss these symptoms does not support a finding that he did not review these records, especially since his testimony touches on other symptoms documented in these records, including dizziness.  *See* R. at 913.  Rather, Dr. Frank's testimony suggests that he thoroughly reviewed the relevant records and considered all possible physical impairments.  *See* R. at 1079.

The ALJ stated the weight he gave Dr. Frank's opinion and provided legitimate supporting reasons for doing so and thus there is no basis for finding he erred in finding that plaintiff does not have any severe physical impairments.  *See* 20 C.F.R. § 404.1527(e)(2)(ii).

### D.  Residual Functional Capacity

Plaintiff argues that the ALJ's RFC determination is erroneous insofar as it does not reflect his non-severe impairment of back pain or the full range of limitations imposed by his mental impairments and does not take into account the combined effect of his impairments.  Docket No. 17 at 10-11, 19-21.

### 1.  Mental Impairments

On February 5, 2002, Dr. Stuart Kutz conducted a detailed Mental Status Examination of plaintiff.  R. at 192.  He found that plaintiff was "capable of independent bathing, dressing and simple meal preparation," that his "social contact seems fair at best," his "mood was mildly to moderately dysphoric and anxious," and his "attention

and concentration seemed fair." R. at 193-94. He found that plaintiff's symptoms suggested a diagnosis of mild or moderate major depressive disorder, generalized anxiety disorder, substance abuse, agoraphobia, and an underlying personality disorder. R. at 194. He found that plaintiff had a Global Assessment of Functioning ("GAF") score of 53[2] and that his "depression, anxiety and substance abuse certainly are chronic." *Id*. He concluded that, "[r]elative to a competitive work setting, his attention/concentration as well as his persistence and pace in task completion would seem fair at best. His social adaptation seems fair at best and perhaps often fair to poor. His understanding and memory are fair to good." R. at 195.

On October 19, 2004, state agency psychologist Brett Valette examined plaintiff. R. at 632. Dr. Valette diagnosed him with polysubstance dependence in full remission and bipolar disorder, which was improving on medication. R. at 634. He assigned plaintiff a GAF score of 65.[3] *Id*. He found that plaintiff's Mental Status Examination "was good except for his short-term memory. He did well on Serial 7's. General fund of information is average. His abstractions were adequate. His proverbs were good. His

_____

[2]"The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012) (citing American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000)). A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id*.

[3]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Keyes-Zachary*, 695 F.3d at 1162 n.1.

10

judgment and reasoning was [sic] adequate." *Id*.

On October 26, 2004, state agency psychiatrist J.F. Dyde completed a

Psychiatric Review Technique on behalf of plaintiff.  R. at 635.  Dr. Dyde found that

plaintiff suffered from an affective disorder, encompassing both manic and depressive

episodes.  R. at 635, 638.  He found that plaintiff was mildly restricted in his activities of

daily living and in his ability to maintain concentration, persistence, or pace; that he was

moderately limited in social functioning; and that he could be expected to experience

one or two episodes of decompensation in an one-year period.  R. at 645.  He found

that plaintiff did not meet the listing for affective disorders.  R. at 646; *see* 20 C.F.R. Pt.

404, Subpt. P, App. 1, § (A)12.04.  Dr. Dyde concluded that plaintiff was "[c]apable of

work of limited complexity requiring up to 6 months to learn, cannot work closely with

supervisors, co-workers and minimal to no inter-action with general public.  Bi-polar

manic depression may occasionally prevent completion of normal workday/week or

cause reduced pace."  R. at 630.

On May 9, 2006, Dr. Kutz conducted another Mental Status Examination of

plaintiff.  R. at 1027.  Dr. Kutz found that plaintiff's "overall social contact seems roughly

fair."  R. at 1029.  He found that plaintiff presented as moderately depressed and

anxious with "ongoing psychotic features, which he attempts to minimize."  R. at 1030.

He confirmed the diagnosis of bipolar disorder and found that plaintiff's presentation

suggested a panic disorder with agoraphobia and a generalized anxiety disorder, but

noticed that these "may be part of his psychotic features."  *Id*.  He found plaintiff had a

GAF of 43.[4]  R. at 1031.  He concluded that plaintiff's "attention/concentration as well as his persistence and pace in task completion probably would be fair to poor, even for simple settings.  His social adaptation is probably fair to poor.  His understanding and memory seemed at least fair to good, but with some question of interference from his psychosis." *Id*.

At the administrative hearing in 2005, Dr. Robert Pelc testified that plaintiff's medical record supported diagnoses of bipolar disorder, generalized anxiety disorder, and substance addiction disorder in remission since 2003.  R. at 588-89.  Dr. Pelc found that the records supported a moderate degree of limitation based on these conditions.  R. at 589.  Specifically, he found plaintiff would have mild restrictions in activities of daily living, moderate restrictions in social functioning, moderate restrictions in maintaining concentration, and no risk of extended periods of decompensation.  R. at 589-90.  Dr. Pelc testified that he based his conclusions on plaintiff's GAF scores, most of which were in a range implicating minimal limitations; on notes from his consultative examinations indicating that plaintiff is capable of caring for himself; notes documenting interaction with family and friends; his record of cooperating with treatment providers; and plaintiff's performance on the mental status examinations administered by Drs. Kuntz and Valette.  R at 590-94.  Dr. Pelc testified that plaintiff would be able to interact on both an occasional and a frequent basis with the general public, co-workers, and

---

[4]A GAF score of 43 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Keyes-Zachary*, 695 F.3d at 1162 n.1.

supervisors; that he could adhere to workplace norms; and that he could perform tasks requiring understanding and remembering up to five instructions.  R. at 594.

At the administrative hearing in 2009, Dr. Pelc testified that plaintiff suffered from bipolar disorder, generalized anxiety disorder, and substance addiction disorder, and, contrary to his previous testimony, noted that the record did not support a finding that plaintiff's alcohol abuse had been in remission at any point.  R. at 1085.  He found that plaintiff did not meet or equal any of the listings for these conditions.  R. at 1086.  He found that plaintiff had moderate restrictions in activities of daily living, social functioning, and maintaining persistence and pace.  *Id*.  He found no episodes of decompensation.  *Id*.  He testified that plaintiff was mildly restricted in his ability to make simple workplace decisions, moderately restricted in his ability to deal with complex or detailed information processing, moderately restricted in his ability to interact with the public, supervisors, and co-workers, and moderately restricted in his ability to adapt to changes in workplace routines.  R. at 1089.  Dr. Pelc explained that his opinion of plaintiff's cognitive ability was based on the mental status examinations performed by Drs. Kutz and Valette.  R. at 1088-89 ("The mental status examinations and descriptions of his cognitive functioning are generally fair, fair to good, both in terms of Dr. Valett [sic], and really early in the file.").  R. at 1087.  Dr. Pelc stated that he used the term "mild" to indicate a slight limitation and the term "moderate" to mean a limitation that, while more than slight, would not preclude the ability to function satisfactorily.  R. at 1090.

The ALJ found Dr. Pelc's testimony to be consistent with plaintiff's medical record and plaintiff's testimony and supported by specific references to the medical

13

evidence.  R. at 729.  The ALJ also considered plaintiff's testimony that (1) medication

helps lessen his depression and anxiety; (2) he is capable of caring for himself and

engaging in "extensive" daily activities; (3) he can pay attention for the duration of a

two-hour movie; and (4) he has looked for and performed part-time work on several

occasions.  R. at 730.  The ALJ accorded considerable weight to Dr. Pelc's opinion and

concluded that plaintiff does not have mental impairments that would preclude him from

performing "a substantial range of activities."  *Id*.

The ALJ noted that, at the 2005 hearing, the VE testified that someone with

plaintiff's RFC who was additionally limited to only occasional interaction with other

people could nonetheless perform plaintiff's past relevant work as a groundskeeper,

parking lot attendant, or truck driver.  R. at 730.

Plaintiff argues that the RFC determination is erroneous because (1) Dr. Pelc's

finding of moderate restrictions is not supported by the reports of Drs. Kutz and Valette,

who found plaintiff's mental status to be only "fair" in many areas; (2) the ALJ's RFC

determination reflects no limitations instead of the moderate limitations found by Dr.

Pelc; and (3) there is no evidentiary support for the ALJ's finding that plaintiff would not

be a distraction to others in the workplace.  Docket No. 17 at 19-21.

Plaintiff relies on *Cruse v. U.S. Dep't of Health & Humans Servs.*, 49 F.3d 614,

618 (10th Cir. 1995) (superseded on other grounds by regulation as stated in *Carpenter

v. Astrue*, 537 F.3d 1264, 1268 (10th Cir. 2008)), for the proposition that the term "fair"

is "defined to mean: 'Ability to function in this areas is seriously limited but not

precluded'" and thus that the use of the term is "evidence of *dis*ability."  *Cruse*, 49 F.3d

at 618 (emphasis in original).  However, *Cruse* considered the meaning of "fair" in the context of a particular form, entitled Medical Assessment of Ability To Do Work-Related Activities.  *Id*.  Drs. Kutz and Valette did not fill out this form.  *See* R. at 192, 632. Plaintiff does not explain why this particular definition of "fair" is applicable in other contexts.  Dr. Pelc's opinion is consistent with Dr. Kutz's finding that plaintiff's "understanding and memory are fair to good," R. at 195, and with Dr. Valette's finding that plaintiff's Mental Status Examination results were "good," except for his short-term memory.  R. at 634.  The ALJ did not err in relying on Dr. Pelc's testimony.

Moreover, the ALJ did incorporate Dr. Pelc's findings of moderate restrictions by limiting plaintiff to simple work requiring no more than five instructions and no decision-making beyond the "routine."  R. at 719.  The ALJ was not required to recite each limitation found by Dr. Pelc in his RFC determination.  Since Dr. Pelc concluded that plaintiff would be able to "function satisfactorily" in a work environment requiring him to make simple decisions, respond appropriately to changes in routine, follow simple instructions, and interact appropriately with co-workers, supervisors, and the general public, R. at 1088-90, the ALJ was permitted to adopt Dr. Pelc's overall conclusion without setting forth the specific limitations underlying Dr. Pelc's conclusion.  *See Atkinson v. Astrue*, 389 F. App'x 804, 807-08 (10th Cir. 2010) ("[T]he ALJ accepted Dr. Glasco's ultimate opinion that all of Mr. Atkinson's limitations would not preclude non-complex work.  Therefore, the fact that the ALJ did not discuss every single limitation used by Dr. Glasco to reach his ultimate opinion is not problematic.") (citing *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996)).

The ALJ's finding that plaintiff is "able to work in proximity to people on a continuous basis without being a distraction," R. at 719, is supported by the ALJ's citation to the record evidence, specifically, evidence that plaintiff reported having and visiting family and friends in 2005, cooperating with healthcare providers, that he can perform personal hygiene tasks, handle money, run errands, perform household chores, could behave within expected norms of workplace, and that plaintiff looked for and obtained part-time work on several occasions.  R. at 726-30.

In sum, the ALJ's RFC determination regarding plaintiff's mental impairments is supported by substantial evidence.

### 2.  Combination of Impairments

Plaintiff argues that the ALJ erred in failing to consider the combined effects of his severe and non-severe impairments.  Docket No. 17 at 8-11.  Defendant counters that the ALJ properly considered all relevant evidence in formulating his RFC determination.  Docket No. 18 at 14-18.

"A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms."  20 C.F.R. § 404.1508.  In determining whether a claimant is disabled, an ALJ must consider "the combined effect of all [] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  20 C.F.R. § 404.1523; *see also* 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' . . . when we assess your residual functional capacity."); SSR 96-8p, 1996 WL 374184, at *5 (July 2,

16

1996).  "The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence."  *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

The ALJ reviewed the evidence of plaintiff's arthritis and back pain.  R. at 715-18.  He noted that plaintiff's pain generally responded well to acetaminophen and ibuprofen; that plaintiff continued to engage in significant daily activities, including riding his bike; that X-rays of plaintiff's joints were normal; and that diagnostic imaging revealed "mild" degenerative changes in his lumbar spine.  *Id.*  The ALJ credited Dr. Frank's opinion that no functional work-related limitations would flow from his physical complaints.  R. at 717.  The ALJ determined that plaintiff's "complaints of arthritic type pain and musculoskeletal conditions constitute no more than a slight abnormality that imposes no more than a minimal effect on his ability to perform basic work activities and are accordingly 'non-severe.'"  R. at 718.

In formulating plaintiff's RFC, the ALJ reviewed plaintiff's testimony regarding his social anxiety; his activities of daily living; his position as "sergeant at arms" for his building council; his history of alcohol use; his compliance with and response to medication over time; his ongoing depression; side effects of his medication, including gastrointestinal concerns; and the opinions of Nurses Belinda Hamilton and Rebecca Howard and of Drs. Joseph Jensen, Charles Oppegard, Robert Pelc, Stuart Kutz, Brett Valette, and James Dyde regarding plaintiff's psychiatric condition.  R. at 719-30.

Given the ALJ's thorough discussion of plaintiff's physical impairments at step three, his reliance on the opinion of Dr. Frank, and his conclusion that none of these impairments would have more than a minimal impact on plaintiff's ability to work, there

17

is no reason to conclude that the ALJ failed to consider plaintiff's impairments in combination in determining plaintiff's RFC.  *See Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009) ("In its entirety, the ALJ's discussion of the evidence and his reasons for his conclusions demonstrate that he adequately considered Claimant's alleged impairments.") (internal citations omitted); *Flaherty*, 515 F.3d at 1071 ("the ALJ's discussion of the evidence and his reasons for his conclusions demonstrate that he considered all of Ms. Flaherty's impairments.").

### E.  Medical Opinions

Plaintiff argues that the ALJ erred in failing to accord sufficient weight to the opinions of his treating psychiatrists and psychiatric nurses.  Docket No. 17 at 11-16. Defendant counters that the ALJ correctly found that the cited opinions were not supported by the medical record.  Docket No. 18 at 18 to 21.

On January 14, 2004, Nurse Belinda Hamilton and Dr. Joseph Jensen completed a Med-9 form[5] for plaintiff in which they set forth diagnoses of bipolar affective disorder and alcohol dependence, for which plaintiff was attending regular treatment.  R. at 695.  They stated that plaintiff had been or would be disabled for a period of twelve months or longer as a result of these impairments and the attendant symptoms of insomnia and anxiety.  *Id*.

On August 18, 2004, Nurse Hamilton and Dr. Jensen completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) for plaintiff in which

---

[5]The Med-9 form is used to determine eligibility for Colorado's Aid to the Needy Disabled program.  *See Chapo v. Astrue*, 682 F.3d 1285, 1289 (10th Cir. 2012); http://dhs.elpasoco.com/Documents/Med-9form4-08.pdf.

they found he was markedly limited in his ability to understand, remember, and carry out instructions and in his ability to make judgments on simple work-related decisions. R. at 419.  They stated he was moderately limited in his ability to interact with the public and markedly limited in his ability to interact with supervisors and co-workers and respond appropriately to work pressures or changes in routine.  R. at 420.  They recommended that he interact with co-workers on an occasional basis.  *Id*.

On January 19, 2005, Nurse Hamilton completed a Med-9 form on behalf of plaintiff in which she opined that he had been or would be disabled for a period of twelve months or longer.  R. at 663.  She stated that plaintiff's "[a]nxiety level remains high.  Small stresses are hard to tolerate."  R. at 662.

On October 19, 2005, Nurse Rebecca Howard and Dr. Joseph Jensen filled out a Medical Source Statement of Ability to Do Work-Related Activities (Mental) for plaintiff in which they indicated that plaintiff is markedly limited in his ability to understand, remember, and carry out simple instructions and make simple work-related decisions and is extremely limited in his ability to understand, remember, and carry out complex instructions and make complex work-related decisions.  R. at 697.  They stated that he experiences poor concentration and slowed patterns of thought.  *Id*.  They opined that he is moderately limited in his ability to interact appropriately with the public and with co-workers, markedly limited in his ability to interact with supervisors, and extremely limited in his ability to respond to usual work situations and changes in workplace routines.  R. at 698.  They stated that these limitations were present in January 2004 when he first visited the Stout Street Clinic.  *Id*.  They stated that plaintiff's symptoms of bipolar disorder would persist in the absence of alcohol use.  *Id*.

19

On August 21, 2007, Dr. Charles Oppegard completed a Med-9 form in which he diagnosed plaintiff with bipolar disorder, generalized anxiety disorder, panic disorder, and compulsive personality disorder.  R. at 931.  He opined that plaintiff was "[f]unctioning a bit better.  Sleeping better.  No psychosis.  No brain organicity.  Communicates satisfactorily.  Problem [sic] interpersonal working relationships.  Occasional excessive alcohol use."  *Id*.  He indicated that plaintiff would be unable to work for a period of six months or more due to his impairments.  R. at 930.

On March 31, 2009, Dr. Oppegard completed a Mental Impairment Questionnaire for plaintiff in which he opined that plaintiff was moderately limited in his ability to understand, remember, and carry out instructions and to make simple work-related decisions.  R. at 979.  He opined that plaintiff was markedly limited in his ability to understand, remember, and carry out complex instructions and to make complex or detailed work-related decisions.  *Id*.  He opined that plaintiff was markedly limited in his ability to interact appropriately with supervisors, co-workers, and the public and to respond appropriately to changes in workplace routine.  R. at 980.  He stated that plaintiff had "[m]arked symptoms of anxiety, sleep disturbance, increased frequency of panic episodes, and phobic avoidance when required to deal with people.  Pessimistic view of life.  Anhedonic.  Not acutely depressed."  *Id*.  He opined that plaintiff was moderately restricted in his activities of daily living, markedly restricted in his ability to maintain social functioning and concentration and was experiencing a continuous episode of decompensation.  R. at 981.  He opined that plaintiff's impairments would interfere with his ability to report to work consistently and work continuously for an eight-hour day.  R. at 980.  He opined that these limitations began in 2003.  R. at 981.

The ALJ discussed all of the cited opinions in his decision.  R. at 724-26.  He accorded Dr. Jensen's opinion little weight because Dr. Jensen only met with plaintiff on November 17, 2004, and, at that meeting, did not perform a thorough psychological examination.  R. at 725 (citing R. at 674).  In addition, plaintiff told Dr. Jensen that his "[m]eds seem to work pretty good;" his sleep remained "good" for eight to nine hours per night; he had decreased irritability but increased anxiety; lithium helped when he became anxious; his mood was "so-so;" and his appetite was good.  R. at 674.  The ALJ concluded that the "results of Dr. Jensen's one treatment encounter with the claimant do not support the marked and extreme limitations reflected in the August 2004 and October 2005 assessments."  R. at 725.

With respect to Nurses Hamilton and Howard, the ALJ stated that he "carefully considered their statements under SSR 06-03p," but that their opinions were entitled to less weight than those of a physician or psychiatrist.  R. at 725.  He concluded that their opinions were not persuasive because "the medical evidence does not support the degree of functional limitation reflected" in the forms they completed.  *Id*.  He further explained: "Treatment notes indicate that the claimant experienced significant improvement in his mental condition with sobriety and when compliant with medication. Although the claimant continued to experience symptoms of depression and anxiety of a varying severity, his symptoms responded to treatment and his condition has remained fairly stable since the alleged onset date."  *Id*.

The ALJ accorded Dr. Oppegard's opinion little weight because it was on an issue reserved to the Commissioner and because he found it to be unsupported by examination findings and inconsistent with other medical evidence of record, "including

the consultative evaluations of record and the persuasive testimony of Dr. Pelc at the hearing."  R. at 725-26.  The ALJ further explained that he found "little evidence that shows the claimant has 'marked' difficulty interacting appropriately with supervisors, co-workers, and the public; or is unable to respond appropriately to usual work situations and to sporadic changes in a routine work setting."  R. at 726.

The ALJ concluded his discussion of these medical opinions by stating: "Furthermore, the assessments discussed above are inconsistent with other substantial evidence of record, including the consultative examinations performed by Dr. Kutz and Dr. Valette, and the testimony of Dr. Pelc."  R. at 726.

If the medical opinion of a treating practitioner is well supported by medically acceptable evidence and is not inconsistent with the other substantial evidence in the record, an ALJ must give it controlling weight.  20 C.F.R. § 416.927(c)(2).  In the event that the opinion of a treating physician does not merit controlling weight, an ALJ must consider the following factors in determining how to evaluate the opinion: length of the treating relationship, frequency of examination, nature and extent of the treating relationship, evidentiary support, consistency with the record, medical specialization, and other relevant considerations.  *Id*.  An ALJ may dismiss or discount an opinion from a medical source only if his decision to do so is "based on an evaluation of all of the factors set out in the cited regulations" and if he provides "specific, legitimate reasons" for his rejection.  *Chapo*, 682 F.3d at 1291.  An ALJ's rejection of a medical opinion based on an incorrect reading of the record is grounds for remand.  *See Mercer v. Colvin*, 2013 WL 785358, at *2 (N.D. Okla. Mar. 1, 2013). "When a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the

22

other physicians' reports to see if they outweigh the treating physician's report, not the other way around." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004).

Since a nurse is not an "acceptable medical source" within the meaning of the Social Security regulations, the opinion of a nurse "cannot establish the existence of a medically determinable impairment." SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Such an opinion can, however, "provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id*. An ALJ should apply the factors listed in 20 C.F.R. § 404.1527(d) when evaluating the opinion of a nurse. *Id*. at *4. "[D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." *Id*. at *5.

An ultimate determination on the question of a claimant's disability is reserved to the Commissioner, 20 C.F.R. § 416.927(d), and thus, a treating physician's opinion that a claimant is disabled may not be given controlling weight or special significance. SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). Nonetheless, the Social Security rules "provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner." *Id*. The Tenth Circuit has declined to impose a categorical rule that the opinion of a treating physician only constitutes substantial evidence when it includes examination findings or treatment notes. *Andersen v. Astrue*, 319 F. App'x 712, 723 (10th Cir. 2009); *see also Angster v. Astrue*, 703 F. Supp. 2d 1219, 1229 (D. Colo. 2010) (finding that an ALJ's

decision to reject a mental impairment questionnaire because it did not include treatment notes was unfounded given that other evidence in the record supported facts of plaintiff's treatment history and was consistent with questionnaire).  In addition, an ALJ may not infer that a treating physician's opinion is of "limited reliability" solely because it is expressed in a form that consists largely of check-boxes and does not ask for extensive rationales.  *Andersen*, 319 F. App'x at 723-24.

Plaintiff argues that the ALJ erred in (1) discounting the opinion of Dr. Jensen who, although he did not treat plaintiff, had the benefit of reviewing his medical record and working with the nurses who did treat him; (2) discounting the opinions of the psychiatric nurses despite their long treatment relationship with plaintiff; (3) discounting the opinions of treating medical sources because they were inconsistent with the opinions of reviewing physicians; (4) failing to apply the factors set forth in 20 C.F.R. § 404.1527(c); and (5) failing to adequately explain the claimed inconsistencies between the opinions of the treating sources and the remainder of the medical record. Docket No. 17 at 11-16.

First, the ALJ did not err in his treatment of Dr. Jensen's opinion.  Since Dr. Jensen was not properly a treating physician, the absence of support for his opinion in his examination notes is a legitimate basis for discounting his opinion.  *See* 20 C.F.R. § 404.1527(c)(2), (3).  Second, as the ALJ's decision makes clear, he discounted the opinions of the psychiatric nurses because he found them inconsistent with other substantial evidence in the record, including plaintiff's reported improvement on his prescribed medication, and not because of their classification as "other medical sources."  *See* R. at 725.

24

Third, the ALJ did not err in discounting the opinion of Dr. Oppegard on the basis

that it was not supported by medical examinations and that the record lacked evidence

of a marked difficulty interacting with co-workers and supervisors.  *See* R. at 726.

While an ALJ may not entirely disregard a treating physician's opinion because it does

not include an explanation of the basis for his findings, "[e]xplanatory material is

certainly relevant in deciding the weight a treating physician's opinion should receive."

*Andersen*, 319 F. App'x at 723.  In this case, the ALJ explained that he accorded Dr.

Oppegard's opinion little weight because it was not supported by the treatment records.

R. at 726.  This was a permissible basis for his decision.  *See* 20 C.F.R. 404.1527(c)(3).

The Court has reviewed Dr. Oppegard's treatment records and, although they reflect

problems with anxiety and avoidance of the public, they also indicate involvement with

activities outside the house, such as attending church and visiting family in another

state, and do not contain evidence of a marked ability to interact with supervisors or

coworkers appropriately.  *Compare* R. at 924 ("Go to Community Room daily–a few

minutes; lasted through a community mtg–couple of hours"); 925 ("Avoids people but is

attending church and has made a friend"); 929 ("Baseball Rockies game thru housing

with a friend.  Enjoyed, but worried when he went to shop to buy a T-shirt.  Fishing with

him in Wyo.  Anxiety acute–last an hour.  Happened while fishing."); and 934 ("Made

the trip.  Bus to DIA–thru security–delayed 2 hours for Chicago weather.  Couple beers

to relax.  Bus to meet brother downtown.") *with* R. at 980.

Fourth, the ALJ's decision clearly sets forth the weight he accorded each medical

opinion and indicates that he applied the relevant factors listed in § 404.1527(c),

including the nature and extent of the treatment relationship, the supportability, and the

25

consistency of the opinions. *See* R. at 725 ("The results of Dr. Jensen's one treatment encounter with the claimant do not support the marked and extreme limitations reflected in the August 2004 and October 2005 assessments."), ("The undersigned does not find these nurses' statements persuasive as the medical evidence does not support the degree of functional limitation reflected in" their opinions.); R. at 726 ("While treatment records show the claimant may have some problems with socialization and anxiety when around others, there is little evidence that shows the claimant has 'marked' difficult interacting appropriately with supervisors, co-workers, and the public; or is unable to respond appropriately to usual work situations and to sporadic changes in a routine work setting."); 20 C.F.R. § 404.1527(c)(2)(ii), (3), and (4). He was not required to "explicitly discuss all the § 404.1527(d) factors for each of the medical opinions before him," but only to "provide[] good reasons in his decision for the weight he gave to the treating sources' opinions," for example, by citing to "contrary, well-supported medical evidence" in the record. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).

Finally, the ALJ's decision references specific points of inconsistency between the medical opinions and the record, including plaintiff's reported improvement to Dr. Jensen, R. at 725; plaintiff's positive response to medication and abstention from alcohol, *id.*; and the lack of evidence that plaintiff has difficulty interacting appropriately with other people. R. at 726.

In sum, the ALJ applied the correct legal standard by providing specific, legitimate reasons for the weight he accorded each medical opinion.

### F.  Requirements of Past Relevant Work

Plaintiff argues that the ALJ erred at step four by failing to "develop any evidence regarding the mental and/or physical demands of the Plaintiff's past relevant work or make any specific findings regarding the mental and/or physical demands of past work." Docket No. 17 at 17.  However, the ALJ also determined at step five that plaintiff is capable of performing other jobs that exist in substantial numbers in the economy, including hospital cleaner, industrial cleaner, cafeteria attendant, and housekeeper.  R. at 731-32.  Accordingly, the finding that plaintiff can perform his past relevant work was not determinative of plaintiff's claim and any error in that finding is harmless.

### G.  Credibility

Plaintiff argues that the ALJ erred in assessing his credibility by picking and choosing from the record.  Docket No. 17 at 22-23.  Defendant counters that the ALJ properly took into account all of the relevant evidence.  Docket No. 18 at 17-18.

"Credibility determinations are peculiarly the province of the finder of fact, and [the Court] will not upset such determinations when supported by substantial evidence." *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990).  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence."  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).  Accordingly, the Court may not "displace the agenc[y's] choice between two fairly conflicting views, even though the [C]ourt would justifiably have made a different choice had the matter been before it de novo."  *Id*.

27

However, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted).  "[A]n ALJ cannot play the role of doctor and interpret medical evidence." *Liskowitz v. Astrue*, 559 F.3d 736, 741 (7th Cir. 2009) (internal citations omitted).  "When additional information is needed to assess the credibility of the individual's statements about symptoms and their effects, the adjudicator must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements."  SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).

The ALJ's decision indicates that he considered plaintiff's testimony, his activities of daily living, and the medical evidence in evaluating plaintiff's credibility.  R. at 719-30. The ALJ is not required to discuss every piece of evidence, so long as he considers the record as a whole.  *See Clifton*, 79 F.3d at 1009-10.  Plaintiff's argument appears to be based on the fact that the ALJ did not specifically mention certain facts in the record that were more favorable to plaintiff than those discussed.[6]  *See* Docket No. 17 at 22 ("While the ALJ noted that Mr. Sedlak was able to travel to Pennsylvania to see family members, the Stout Street Clinic records noted that, following such a visit, Mr. Sedlak had 'many disappointments at home; feeling depressed.'").  The evidence plaintiff cites in support of his claim does not undermine the substantial evidence upon which the ALJ

---

[6]Plaintiff also challenges the ALJ's credibility determination based on the following language in the ALJ's decision: "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Docket No. 17 at 22.  However, this is boilerplate language setting forth the ALJ's conclusion and not the starting point for his analysis.

28

relied.  Plaintiff, in effect, is asking the Court to reweigh the evidence and come to its

own conclusion; this the Court cannot do.  *See Flaherty*, 515 F.3d at 1070.

The ALJ's credibility determination was linked to substantial evidence in the

record, much of which has already been reviewed at length.

## III.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the decision of the Commissioner that plaintiff was not disabled

is AFFIRMED.

DATED February 24, 2014.

BY THE COURT:

 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge